# In the United States Court of Federal Claims

No. 12-889L and No. 13-404L (Consolidated)

(Filed: January 28, 2016)

| | | |
|---|---|---|
| | ) | Rails-to-trails takings case; class action; |
| CLAUDE SEARS, et al., | ) | interest rate to be applied as part of the |
| | ) | otherwise tentatively agreed just |
| Plaintiffs, | ) | compensation for a subclass |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Thomas S. Stewart, Stewart Wald & McCully LLC, Kansas City, Missouri, for plaintiffs. With him on the briefs were Elizabeth G. McCulley and Steven M. Wald, Stewart Wald & McCully LLC, Kansas City, Missouri, and St. Louis, Missouri.

Gregory D. Page, Trial Attorney, Natural Resources Section, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C., for defendant. With him on the briefs was John C. Cruden, Assistant Attorney General, Environment & Natural Resources Division, United States Department of Justice, Washington, D.C.

**OPINION AND ORDER**

LETTOW, Judge.

Before the court in this rails-to-trails takings case are the government's motion for partial summary judgment and plaintiffs' cross-motion for partial summary judgment under Rule 56(a) of the Rules of the United States Court of Federal Claims ("RCFC"). Both motions pertain to the interest rate that should be applied beyond February 3, 2016 as part of the just compensation that has otherwise been tentatively agreed for the largest subclass of plaintiffs as a result of the alleged taking.

At issue in this case are 269 parcels of land in Marshall and Hardin Counties, Iowa that adjoin a former railroad line operated by Iowa River Railroad, Inc. that has been converted into a trail. In October 2015, the parties notified the court that after approximately four months of settlement negotiations, they had reached a tentative agreement on just compensation except for the continuing rate of interest to which plaintiffs would be entitled beyond February 3, 2016. At

that time, the parties proposed and the court accepted that the parties would brief the issue of continuing interest for the court's decision.[1]

The government argues that the continuing interest rate should be based on the United States Treasury's Separate Trading of Registered Interest and Principal of Securities ("STRIPS") five-year instrument. The plaintiffs object to the STRIPS interest rate as artificially low and contend that an interest rate based on the annual return of a diversified mutual fund such as the Vanguard Balanced Index Fund ("VBINX"), or alternatively the Moody's Long-Term Aaa Corporate Bond Index ("Moody's Aaa Index"), would provide just compensation to plaintiffs. For the reasons discussed in this opinion, the court has concluded that the Moody's Aaa Index is the appropriate basis for determining the continuing interest rate to which the tentatively settling subclass may be entitled.

## BACKGROUND

The 269 parcels at issue in this case contain a portion of a right-of-way for railroad purposes previously held by Iowa River Railroad "extending from milepost 243.35 near Marshalltown, Iowa, to milepost 209, outside Steamboat Rock, Iowa, a total distance of 34.35 miles, in Marshall and Hardin Counties, Iowa." *Sears*, __ Fed. Cl. at __, 2015 WL 9311530, at *1. Under provisions of the National Trails Systems Act, the federal government's Surface Transportation Board issued a Notice of Interim Trail Use or Abandonment ("NITU") on August 2, 2012, converting the right-of-way from railroad use to a public trail. *Id.* Plaintiffs claim that Iowa River Railroad had abandoned the right-of-way prior to its conversion to a trail, and as a result, plaintiffs had regained full rights to the land free of any easement. *Id.* at *2. Consequently, plaintiffs assert "that by issuing the NITU . . . , the government has taken their property interests without compensation in contravention of the Fifth Amendment." *Id.*

The court certified the original class in this case in July 2013 and the parties conducted pre-trial proceedings until June 2015, at which point the parties notified the court they were negotiating a settlement agreement. *Sears*, __ Fed. Cl. at __, 2015 WL 9311530, at *2. However, plaintiffs' counsel noted there was difficulty in resolving the claims pertaining to certain "severed agricultural properties." *Id.* By August 31, 2015, the parties had resolved property values and had agreed on an interest rate for the period between August 2, 2012 (the date of the NITU) and February 3, 2016. *Id.* In October 2015, however, the parties informed the court that they had reached an impasse on the remaining issue in the settlement negotiations: the continuing rate of interest beyond February 3, 2016. *Id.* The parties presented various options to resolve this dispute, and the court and the parties accepted ultimately that the parties would brief the continued-interest issue for the court's decision. *Id.* That briefing pertains to the subclass of

---

[1]Owners of 21 of the 269 parcels at issue balked at the partial settlement as it was being completed and requested that the court schedule a trial respecting their claims. *See Sears v. United States*, __ Fed. Cl. __, 2015 WL 9311530 (Dec. 22, 2015). At the request of those disagreeing owners, the court split the class into two subclasses, the angularly-bisected agricultural-property subclass for those wishing to proceed to trial and a settlement subclass for those desiring to maintain the partially-agreed settlement. *Id.*, __ Fed. Cl. at __, __, 2015 WL 9311530, at *4-*6.

248 of 269 parcels, the owners of which may proceed with settlement and excludes the angularly-bisected agricultural-property subclass that will proceed to trial. *Id.* at \*6.

The key to this dispute is the interest-rate posture existing in the United States during the period commencing with the date of the taking, August 2, 2012. The government submitted its motion for partial summary judgment on the continuing interest issue on December 11, 2015. United States' Mot. for Partial Summary Judgment Regarding the Interest Rate to Be Applied After February 3, 2016 ("Def.'s Mot."), ECF No. 56. In its motion, the government argues that a market interest rate for United States Treasury securities, and specifically the interest rate associated with five-year STRIPS, is the most appropriate rate for application to delayed compensation in takings cases such as this one, where the United States is in essence a borrower and the plaintiffs are creditors. Def.'s Mot. at 2-3. Plaintiffs submitted their cross-motion on January 6, 2016, arguing conversely that the five-year STRIPS rate undervalues plaintiffs' "loan" to the government, and that the VBINX rate of return, or alternatively the Moody's Aaa Index rate of return, would more accurately represent the return expected by a reasonably prudent investor during the same time period. Pls.' Resp. to Def.'s Mot. and Cross-Mot. for Partial Summary Judgment Regarding the Interest Rate to Be Applied After February 3, 2016 ("Pls.' Cross-Mot.") at 3-4. Both parties submitted declarations by proffered experts in support of their positions. *See* Def.'s Mot. Ex. B (Decl. of Dr. William R. Johnson, Georgia Bankard Professor of Economics at the University of Virginia (Dec. 11, 2015) ("Johnson Decl.")); Pls.' Cross-Mot. Ex. A (Decl. of Prof. Todd T. Milbourn, Hubert C. and Dorothy R. Moog Professor of Finance at the Olin Business School, Washington University in St. Louis (Jan. 4, 2016) ("Milbourn Decl.")). The issue has been fully briefed and addressed at a hearing on January 26, 2016, and it is now ready for disposition.

## ANALYSIS

### A. *Partial Summary Judgment*

Under RCFC 56(a), the court will grant summary judgment on any claim or defense – or any part thereof – when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A genuine dispute is one that "may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. With regard to issues of material fact, the court must draw inferences from the underlying facts "viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962)). Where cross-motions for summary judgment have been filed on the same claim or part of a claim, "the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987).

In this instance, the parties agree on all facts material to the question of what interest rate should be applied to any compensation due to the subclass beyond February 3, 2016. The parties do not dispute that the date of the alleged taking is August 2, 2012, nor do they dispute the reported rates of return since that time of the three instruments (five-year STRIPS, the VBINX,

and the Moody's Aaa Index) proffered as options on which to base the continuing interest rate. *See* Johnson Decl. at 14 (reporting the annual market yield of a five-year STRIPS instrument on August 3, 2012 as 0.752 percent, and the annual yield of the Moody's Aaa Index as 3.39 percent during the same period); Milbourn Decl. ¶ 28 & Ex. E (reporting the annualized return of the five-year STRIPS instrument as 0.757 percent, the Moody's Aaa Index as 3.39 percent, and the VBINX as 9.0 percent).[2]  With this agreement on the underlying facts, the parties focus their attention on the pertinent inferences to be drawn from the facts and the legal test to be applied to those inferences. *See* RCFC 56(a).

B. *Applicable Pre-Judgment Interest Rate Beyond February 3, 2016*

The Fifth Amendment to the U.S. Constitution provides that the U.S. government cannot take private property for public use without providing the property owner "just compensation." U.S. Const. amend. V.  In most cases, "just compensation" is the "fair market value of the property on the date it is appropriated." *Kirby Forest Indus. v. United States*, 467 U.S. 1, 10 (1984).  If there is a delay between the time the property is taken and the receipt of compensation, the owner is also entitled to interest "sufficient to ensure that he is placed in as good a position pecuniarily as he would have occupied if the payment had coincided with the appropriation." *Id.* (citing *Phelps v. United States*, 274 U.S. 341, 344 (1927); *Seaboard Air Line R. Co. v. United States*, 261 U.S. 299, 306 (1923)).

---

[2]The government's expert, Professor Johnson, disagrees that the VBINX yield was a consistent 9.0 percent, noting that of "43 quarters from January 1, 2005 to September 30, 2015, VBINX had a negative total return in thirteen quarters, or over 30 percent of this period." Def.'s Reply Ex. C (Second Decl. of Dr. William R. Johnson ("Johnson Second Decl.")), ECF No. 64. Because the VBINX includes both debt and equity securities, Milbourn Decl. ¶¶ 169-177 (addressing returns of balanced funds), some amount of volatility is perhaps to be expected.

Professor Milbourn advocated determining an interest rate by taking into account the risk attendant to the property being taken, in this instance, Iowa farm land, which historically has varied significantly in value over time. Milbourn Decl. ¶¶ 125-128.  Correlatively, Professor Johnson commented that "Iowa farmland is . . . a risky investment historically, and its price changes also overstate the investment return because of the costs of holding land." Johnson Decl. ¶ 48; *see also id.* at 23 (setting out in graphical form the annual rate of change in the average price of Iowa farmland located in Hardin and Marshall counties).

Nonetheless, in determining an appropriate interest rate, the court has not taken into account the risk inherent in the property being taken, *i.e.*, Iowa farmland.  The risk tolerance of the property owner-investor does not necessarily guide application of the prudent investor rule. *See Independence Park Apartments v. United States*, 61 Fed. Cl. 692, 717 ("The prudent-investor rule does not turn on how a particular plaintiff would have invested a recovery.  Rather, it seeks to assure 'how a reasonably prudent person would have invested the funds to produce a reasonable return while maintaining safety of principal.'" (quoting *Tulare Lake Basin Water Storage Dist. v. United States*, 61 Fed. Cl. 624, 627 (2004)) (some internal quotation marks omitted)), *mot. for recons. granted in part and denied in part on other grounds*, 62 Fed. Cl. 684 (2004), *rev'd and remanded on other grounds*, 449 F.3d 1235 (Fed. Cir. 2006), *clarified on reh'g*, 465 F.3d 1308 (Fed. Cir. 2006).

There is no consensus among courts as to the interest rate that should be applied in claims for just compensation under the Fifth Amendment. *See Tulare Lake*, 61 Fed. Cl. at 627. In some cases, courts have applied the interest rate set forth in the Declaration of Taking Act, 40 U.S.C. § 3116, which states that in condemnation cases, the interest rate shall be tied to the "one-year constant maturity Treasury yield" (the yield of the security known as the 52-week Treasury bill, or "T-bill"). *See, e.g.*, *Textainer Equip. Mgmt. Ltd. v. United States*, 99 Fed. Cl. 211, 223 (2011) (adopting the position that "[a]bsent special proof, the statutorily-set rate in the [Declaration of Taking Act] shall apply"); *Vaizburd v. United States*, 67 Fed. Cl. 499, 504 (2005) (same); *NRG Co. v. United States*, 31 Fed. Cl. 659, 668-69 (1994).[3] In other instances, courts have applied an interest rate based on an instrument appropriate to the specific factual setting at hand, particularly "the economic circumstances prevailing in the years between the date of the taking and the [projected] date of payment." *Georgia-Pacific Corp. v. United States*, 640 F.2d 328, 366 (Ct. Cl. 1980) (applying a variable interest rate based on the Moody's Index for a takings period from 1975 to 1980); *see also Antoine v. United States*, 710 F.2d 477, 480 (8th Cir. 1983) (affirming the application of a five-percent interest rate based on "economic circumstances between the date of taking and the date of payment"); *Miller v. United States*, 620 F.2d 812, 840 (Ct. Cl. 1980) (applying a circumstance-based methodology to a takings period from 1968 to 1980); *Pitcairn v. United States*, 547 F.2d 1106, 1120-21 (Ct. Cl. 1976) (applying a similar methodology to a takings period from 1947 to 1975); *Tulare Lake*, 61 Fed. Cl. at 628 (basing the interest rate on the rate of return from three state-sanctioned investment accounts proposed by plaintiffs).

As the government notes in its motion, this court has previously determined the appropriate interest rate in takings cases based on three criteria: (1) the amount of risk to the creditor, (2) the length of the interest period as compared to the maturity of the instrument on which the interest rate is based, and (3) the "uniformity of treatment to similarly situated litigants." *Independence Park*, 61 Fed. Cl. at 716-17 (citing *Georgia-Pacific Corp.*, 640 F.2d at 365-66); *see* Def.'s Mot. at 2-3 (citing *National Food & Beverage Co. v. United States*, 105 Fed. Cl. 679, 704 (2012) (applying these criteria and selecting a STRIPS rate as the appropriate determinant of interest); *Arkansas Game & Fish Comm'n v. United States*, 87 Fed. Cl. 594, 646 (2009) (same), *rev'd on other grounds*, 637 F.3d 1366 (Fed. Cir. 2011), *rev'd and remanded*, __ U.S. __, 133 S. Ct. 511 (2012), *aff'd after remand from the Supreme Court*, 736 F.3d 1364 (Fed. Cir. 2013); *CCA Assocs. v. United States*, 75 Fed. Cl. 170, 205 (2007) (same), *aff'd in part, vacated in part, and remanded on other grounds*, 284 Fed. Appx. 810 (Fed. Cir. 2008)). The court explicitly based these criteria on the "prudent investor rule," which seeks to determine "how 'a reasonably prudent person' would have invested the funds [owed by the government] to 'produce a reasonable return while maintaining safety of principal.'" *Independence Park*, 61 Fed. Cl. at 717 (quoting *Tulare Lake*, 61 Fed. Cl. at 627 (in turn quoting *United States v. 429.59 Acres of Land*, 612 F.2d 459, 464-65 (9th Cir. 1980))). In doing so, this court rejected the

---

[3]The Declaration of Taking Act applies to condemnation cases in which the government formally uses its power of eminent domain to seize property for public use. 40 U.S.C. § 3114; *see also Tulare Lake*, 61 Fed. Cl. at 629 (explaining the legislative history and recounting the Supreme Court's interpretation of the Act). Its provisions are not binding on other types of Fifth Amendment takings cases, such as the present rails-to-trails case. *Tulare Lake*, 61 Fed. Cl. at 629.

assertion that where the United States is the defendant, the prudent investor rule requires the interest rate to be based on U.S. Treasury securities, particularly when another instrument such as the Moody's Aaa Index can provide a similar "safety of principal" investment over a period spanning a number of years. *Id.*

Here, the government urges that U.S. Treasury bonds "are the only market interest rates . . . that the Fifth Amendment requires to rectify delays in paying just compensation" because these are the only rates "for loans to the United States that are certain to be repaid with interest." Def.'s Mot. at 2. In effect, the government argues that because the United States was the "borrower" in this case, the interest rate must be tied to a government-sponsored instrument because those instruments provide a matching level of payment risk to the creditors, *i.e.*, the plaintiffs in this case. *Id.* To support this contention, the government's expert, Professor Johnson, focuses on the role of the United States as the "borrower" and the attendant need to tie the interest rate to an instrument with the same certainty of payment as a U.S. government bond because "there is no true risk of default here." Johnson Decl. ¶ 14. For this reason, Professor Johnson rejects the use of a "riskier" instrument such as the VBINX or the Moody's Aaa Index because it "would overcompensate plaintiffs by rewarding them for risks that they clearly would not take here." *Id.* ¶ 13.

By contrast, the subclass plaintiffs argue that an interest rate tied to government securities would not satisfy the prudent investor rule because these rates have been kept at artificially low levels since the financial crisis struck late in 2008. Pls.' Cross-Mot. at 14 (citing Milbourn Decl. ¶¶ 79-80). Indeed, plaintiffs argue that a reasonably prudent investor would *not* have invested in Treasury notes since 2008 because interest rates on these securities have been negligible over the ensuing time, and not sufficient to match the rate of inflation. *Id.*; *see also* Milbourn Decl. ¶ 82; *see also* Second Johnson Decl. ¶ 8 ("In a severe financial crisis, such as 2008 for example, there is a flight to the safety of United States securities by investors, so the demand for government bonds rises (and thus their interest rates fall) relative to the demand for riskier corporate debt."). Instead, as plaintiffs would have it, a reasonably prudent investor would invest in a diversified mutual fund such as VBINX, which they argue still provides a comparatively low risk coupled with a much higher rate of return. *Id.* at 20-21. Alternatively, plaintiffs acknowledge that the Moody's Aaa Index has consistently been used as a "fair and proper measure" of interest rates, particularly when there is evidence that Treasury securities are not an adequate reflection of general market or investment trends. *Id.* at 27-28.

As a threshold matter, the court is not obliged to base the interest rate on U.S. Treasury securities simply because the U.S. government is the alleged "borrower." *See Independence Park*, 61 Fed. Cl. at 717. Treasury securities may not be appropriate measures of the interest rate due to plaintiffs depending upon "the economic circumstances prevailing in the [pertinent] years." *Georgia-Pacific Corp.*, 640 F.2d at 366; *Miller*, 620 F.2d at 840; *Pitcairn*, 547 F.2d at 1120-21; *Tulare Lake*, 61 Fed. Cl. at 628. If those circumstances reflect atypical market conditions or exceptional interest-rate policies by the Federal Reserve System, Treasury securities may not be suitable benchmarks. The guiding principle throughout is the prudent investor rule, which seeks to account for all relevant factors in its contemplation of what a reasonably prudent investor would do under similar circumstances. *Independence Park*, 61 Fed. Cl. at 717.

Interest rates on U.S. Treasury securities have been kept artificially low since the financial crisis of 2008.  *See* Pls.' Cross-Mot. at 15 (noting that the average one-year Treasury rate was 6.1 percent prior to 2008, but has been 0.23 percent since 2009); *see also* Milbourn Decl. at ¶¶ 89-90 (citing the Board of Governors of the Federal Reserve System's Response to the Financial Crisis and Actions to Foster Maximum Employment and Price Stability, set out at http://www.federalreserve.gov/monetarypolicy/bst_crisisresponse.htm (last visited Jan. 27, 2016)); Johnson Decl. ¶ 38; *Adkins v. United States*, Nos. 09-503L, 09-241L, & 09-158L, 2014 WL 448428, at *1-*2 (Feb. 4, 2014) (noting that Moody's Index, as opposed to U.S. Treasury securities, "provided the best approximation of actual market conditions from 2007 to 2012"); *Biery v. United States*, Nos. 07-693L & 07-675L, 2012 WL 5914521, at *4 (Nov. 27, 2012) (deciding to apply Moody's Index because Treasury securities "ha[d] been held artificially low for much of the relevant timeframe" (2004-2012)), *appeal pending*, No. 14-5084 (Fed. Cir.).  Not until December 2015 did the Federal Reserve raise the benchmark federal-funds rate above near-zero, and then it only raised that rate to 0.25 percent.  *See* Board of Governors of the Federal Reserve System, Open Market Operations, http://www.federalreserve.gov/monetary policy/openmarket.htm (last visited Jan. 27, 2016).

Professor Johnson, the government's expert, recognizes that an investment in relatively short-term U.S. securities has recently been, and in the near future could well be, less than the rate of inflation.  As he puts it:

> In that case there would be erosion of purchasing power (though slightly less than I previously calculated because of the negative inflation rate for November 2015).  I showed how the plaintiffs could be easily compensated for any purchasing power loss by calculating the prejudgment interest rate as the maximum of the five-year STRIPS rate or the inflation rate.  Further, . . . over the past fifteen years, the STRIPS rate usually exceeds the inflation rate and thus has not simply protected this security's principal or cash basis, but also has increased purchasing power by providing investors with positive real rates of return averaged over the entire period between 2000 and 2014, though clearly not for some subperiods.

Second Johnson Decl. ¶ 6.  The failure of five-year STRIPS to keep pace with inflation over the pertinent period in this case confirms a determination that the five-year STRIPS rate is an inappropriate basis for deriving interest as a part of just compensation on the property value taken.

In short, under present market conditions, a prudent investor would seek a higher rate of return over a period that encompassed the time since August 2012 and extended at least through a substantial portion of 2016 (when payment of just compensation might occur at the earliest), even if such an investment would involve a slightly higher risk.  In addition, in an interest-rate environment changing from artificially very low rates, liquidity becomes an issue.  Because of the Assignment of Claims Act, 31 U.S.C. § 3727, plaintiffs in this takings case could neither sell their claims against the government for just compensation nor could they pledge those claims as security for a borrowing.  *See* Milbourn Decl. ¶ 104.  That detriment should also be taken into account in the court's determination of an appropriate interest rate.

Nonetheless, the court does not agree with plaintiffs that a diversified mutual fund such as VBINX is the best instrument against which to measure the interest rate due in this case. Although such an investment might otherwise be considered "prudent" under some economic conditions, it does not currently comport sufficiently with the "minimal risk" criterion. *See* Pls.' Cross-Mot. at 23-34 (acknowledging that the VBINX fund has a volatility of 7.4 percent); Def.'s Reply at 5. By contrast, this court has already recognized the Moody's Index as "an indicator of broad trends and relative levels of investment yields or interest rates" and as an instrument that "cover[s] the broadest segment of the interest rate spectrum." *Pitcairn*, 547 F.2d at 1124. Thus, although the government notes that the Moody's Aaa Index had a 10-year default rate of 0.52 percent between 1971 and 2007, Def.'s Mot. at 13, this type of investment still would provide a comparatively minimal risk over the longer term, particularly since these "Aaa rated" bonds are specifically classed as relatively safe investments, Milbourn Decl. ¶¶ 74-75; *see also* Second Johnson Decl. ¶ 3 ("Dr. Milbourn and I agree that defaults by highly rated companies are relatively rare events but they do occur."). Moreover, as Professor Johnson acknowledges, "Dr. Milbourn opines (paragraphs 85-86) that, during the financial crisis, corporate bonds were less affected by Federal Reserve policy than U.S. bonds. He bases that statement on the observation that corporate interest rates fell less (proportionately) than did government interest rates during the 'Great Recession' that began in 2008, which can be seen in Figure 1 of my first declaration." Second Johnson Decl. ¶ 7.

Consequently, the court concludes that the appropriate measure for interest beyond February 3, 2016 in this case is an annual rate of 3.39 percent, compounded quarterly, reflecting the Moody's Long-Term Aaa Corporate Bond Index, because that rate comports with the prudent investor rule in the circumstances at hand.[4]

## CONCLUSION

For the reasons stated, the government's motion for partial summary judgment is DENIED, and plaintiffs' motion for partial summary judgment is GRANTED in part and DENIED in part. The rate of return from the Moody's Long-Term Aaa Corporate Bond Index, *i.e.*, 3.39 percent, compounded quarterly, shall be used to determine the interest component of the just compensation due to the subclass plaintiffs beyond February 3, 2016.

The court requests that the parties file a joint status report on or before February 17, 2016, respecting whether a settlement is now feasible for the larger "settlement" subclass and regarding proposed arrangements for trial of the claims of the angularly-bisected agricultural-property subclass.

---

[4]By advocating use of five-year STRIPS as the measure of interest, the government in essence concedes that compounding is appropriate here because STRIPS are "zero coupon obligation[s]" paid at face value on maturity, Johnson Decl. ¶ 21, with the compounded interest determined by the discount at which they are purchased and the time to maturity.

9

It is so **ORDERED**.

s/ Charles F. Lettow
Charles F. Lettow
Judge